UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NARDELIA ALISON JONES,

               Plaintiff,

v.

WHIRLPOOL CORPORATION,
a foreign corporation,

               Defendant.

Case No.

Hon:

_____/

Carl R. Edwards (P24952)
Alice B. Jennings (P29064)
EDWARDS & JENNINGS, PC
Attorneys for Plaintiff
65 Cadillac Square, Suite 2710
Detroit, MI 48226
(313) 961-5000
ajennings@edwardsjennings.com
cedwards@edwardsjennings.com

_____/

**A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in U.S. District Court, Eastern District of Michigan, where it was given case number 2:18-cv-14012-TGB-MKM and assigned to Judge Terrence G. Berg. The action has been dismissed and is no longer pending.**

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, NARDELIA ALISON JONES, by and through her

attorneys, Edwards & Jennings, PC, by Carl R. Edwards and Alice B. Jennings, and

in support of her Complaint against Defendant Whirlpool Corporation, states as follows:

1.      Plaintiff, Nardelia Alison Jones, is a resident of Berrien County, City of Benton Harbor, State of Michigan.

2.      Defendant, Whirlpool Corporation, is doing business in Berrien County, City of St. Joseph, State of Michigan.

3.      Plaintiff, at all times, was employed at Defendant's corporate headquarters, in Benton Harbor, Michigan.

4.      All acts and omissions by Defendant's officers, executives, directors; its Human Resources Department; Disability Department, personnel and agents, including but not limited to Chief Executive Officer (CEO) Marc Bitzer; Joseph Liotine, President – North America; James Keppler, Vice President - Integrated Supply Chain; and R. J. Corning, Sr. Director - Human Resources; Carey Martin, Vice President - North America Human Resources;  were acting within the scope of their employment, at all relevant time periods stated in this Complaint.

## STATEMENT OF JURISDICTION

5.      The amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars.

6.      On October 2, 2018, Plaintiff, as Defendant Whirlpool's Senior Director of Customer Fulfillment of North American, filed an Equal Employment

Opportunity Commission (EEOC) Charge No. 471-2018-04979 with counts of age and race discrimination; and retaliation.

7.    On or about October 21, 2018, Plaintiff Jones received a "Notice of a Right to Sue" letter from the EEOC, dated October 11, 2018, for her Charge No. 471-2018-04979.

8.    Plaintiff Jones, a fifty-seven (57) year old African American female, timely brings this Complaint with Counts, under the Age Discrimination Act of 1967, as amended, 29 USC §621-634, (ADEA) and Title VII of the Civil Rights Act of 1964, as amended.  Further, Plaintiff states a Count of Retaliation and Hostile Work Environment under both the ADEA and Title VII.  Plaintiff brings ancillary State of Michigan counts for age, race and retaliation; and Hostile Work Environment under the Michigan Elliott-Larsen Civil Rights Act.

## STATEMENT OF FACTS

9.    Plaintiff Nardelia Alison Jones (Alison Jones) is a fifty-seven (57) year old, African American female.  Plaintiff received her Bachelor of Science degree in Industrial Engineering from the Louisiana Tech  University in Ruston, Louisiana in 1984 and a Master of Science in Manufacturing Management from General Motors Engineering and Management Institute (GMI), now Kettering University, in 1990.

10.    From 1984 to 2001, Plaintiff worked for General Motors Corporation in its Packard Electric Division, in a supervisory, then management, capacity.

Plaintiff was evaluated as a "high potential" employee.  Each promotion Plaintiff received brought her more responsibility, budget, staff, and territory.  By 1999, Plaintiff was Director, Production Control and Logistics.

11.    In 2001, Plaintiff became an employee of the Delphi Corporation in Troy, Michigan.  From 2001 to 2015, while employed by Delphi, Plaintiff Jones held the following executive positions:

- Executive Director, Production Control & Logistics;

- Executive Operations/Production Line Director; and

- Executive Director, Global Supply Chain Logistics.

12.    As an employee of Delphi Corporation, Plaintiff Jones was recognized as a "high potential" employee throughout her career.  Plaintiff by 2011, had reached the Executive Director level at a Fortune 500 company, a level directly reporting to a Vice President.  In keeping with her career goals and objectives, Plaintiff Jones next planned and expected to become a Vice President either at Delphi or at another Fortune 500 company.

13.    On or about April 20, 2015, Plaintiff was contacted by an executive international search corporation, about a position which was defined by the search corporation as follows:

> "As a result of aggressive global growth and expansion, our client has retained us to fill a ***highly visible* Senior Director Distribution & Logistics (Vice President Equivalent in most companies)** search. Our client, which is the undisputed leader in its industry, is widely

regarded as being one of the best companies to work for!  Recent accolades have included: *Corporate Responsibility Magazine's 100 Best Corporate Citizens, Business Week's 100 Most Innovative Companies, Diversity Inc.'s Top 50 Companies for Diversity, Straight for Equality Workplace Excellence Award from PFLAG, Fortune's Most Admired Companies, and Outie Awards finalist for Workplace Excellence.*  We have been asked to identify a strong leader capable of driving operational excellence across all of logistics (including international), transportation, damage prevention, and distribution operations – supporting over $10 Billion in sales.  This is a key role within the Integrated Supply Chain organization, and the exceptional performer will be seen as a quick and logical successor to the Vice President Integrated Supply Chain (Senior Vice President equivalent in most companies).  This position will be *based in the upper Midwest and our client is committed to hiring the best of the best so the total compensation package being offered will reflect that.*"

14.   Plaintiff Jones, on May 4, 2015, based upon the Whirlpool position description given to the executive search corporation, as a Vice President equivalent with a "quick and logical successor to the Vice President Integrated Supply Chain", advised the "executive search corporation" she was interested.  Plaintiff, an African American, considered the Defendant's reported "diversity status" to be key to her interest based upon her own interest and work on diversity at both General Motors and Delphi.

15.   From June 8, 2015 through September 2015, Plaintiff was aggressively recruited to Defendant Whirlpool, meeting with numerous executives involved in her evaluating for hire.

16.   Plaintiff met with a substantial number of Defendant Whirlpool's executives in the interview process, in addition to James Keppler, Vice President -

Integrated Supply Chain; and R. J. Corning, Sr. Director - Human Resources. Plaintiff met with Carey Martin, Vice President - North America Human Resources; Lynanne Kunkel, Vice President - Global Talent Development; Joseph Liotine, President – North America; Kenneth Kleinhample, Vice President - Customer After Care; and Paula Cook, Senior Director – Finance.

17.     During each of her interviews Plaintiff Jones stated repeatedly that her interest in the Defendant Whirlpool position was based on the position being a short stepping stone to Vice President.  Plaintiff was advised by Vice President Keppler that she would be in succession for placement in his role as a Vice President, Integrated Supply Chain, or in succession for Kenneth Kleinhample's role of Vice President of Consumer and Appliance Care.

18.     On or about September 3, 2015 Plaintiff Jones was made an offer to leave Delphi Corporation and join Defendant Whirlpool, as its Senior Director of North America Logistics.  After some additional negotiations, Plaintiff signed a contract of hire on September 21, 2018, which stated "Please accept this as evidence of our enthusiasm to have you join Whirlpool Corporation.  We are confident that your career at Whirlpool will be challenging and rewarding".  Vice President Keppler of Integrated Supply Chain and Quality signed the contract on behalf of Defendant Whirlpool.

19.    On or  September 10, 2015, Plaintiff talked with Joseph Liotine –
President of North America, who personally encouraged Plaintiff to take the offer.
Plaintiff Jones advised President Liotine that her goal was a Vice-President position
at Whirlpool.  President Liotine assured Plaintiff Jones that an opportunity for her
advancement to Vice-President existed.

20.    As Plaintiff Jones began her employment as a Senior Director at
Whirlpool the executive level of Defendant Whirlpool, Director level and above
consisted, in November 2015, of a few hundred employees at the highest level
globally.

Of the executives at Whirlpool, there were no African American Vice-
Presidents, globally, and only one African American female was a Senior Director.
While Defendant had one African American corporate officer when Plaintiff
applied, he retired before Plaintiff began her employment in November 2015.

21.    Defendant in its one hundred and eight (108) year history has never had
an African American female Vice-President in any operational position.

22.    On November 2, 2015, Plaintiff began her employment with Defendant
Whirlpool, as Senior Director of Logistics, North America, reporting to James F.
Keppler, Vice President Integrated Supply Chain.  Plaintiff was assigned six (6)
direct reports, with a total number of Four Hundred Fifty (450) employees reporting

under her leadership.   Plaintiff's budget was Nine Hundred Million ($900,000,000.00) Dollars.

23.     On December 1, 2015, Plaintiff received her first Annual Performance Review of "Strong Results" though she had only been with Defendant a month.

24.     Upon Plaintiff's arrival she took over a staff which had not had a permanent leader in over one-half year.  Plaintiff evaluated her area thoroughly and reported after a short period of review and evaluation in a correspondence titled "Observation, Focus Areas – Striving for Extraordinary Results", "What Needs to Be Done" – "2016 and Beyond, Logistics Forward Direction Executing the ISC Roadmap".

25.     Plaintiff, in late 2015 and 2016, set to work, addressing her Department's technical logistical work issues, and people issues, which in some instances had been longstanding systemic problems in Defendant's corporation, including but not limited to:

- Product quality and availability, impacting Defendant's ability to meet customer's on time delivery promises;

- Inadequate or non documented business processes;

- Expired contracts with logistic service providers;

- Underutilized transportation equipment; and

- Utilizing more expensive non-primary carriers.

26.     On December 4, 2015, Plaintiff met with her "assigned executive on-boarding coach" Robert Domitrovich.  This was Plaintiff's only contact with Coach Domitrovich because he resigned from Defendant Whirlpool a short time later.  No effort was made by Vice President Keppler or Human Resources to replace her corporate mentor.

27.     Defendant's Annual Performance Reviews have the following categories:

Results vs Objectives

- Unacceptable Results: Does not meet objectives

- Results need to be Improved: Meets most objectives

- Strong Results: Meets and/or exceeds objectives

- Very Strong Results: Delivers results well beyond objectives

- Extraordinary Results: Delivers break-through results

Defendant's executives' performance review evaluation is connected to the percentage of bonus an employee receives each year.  An executive with "Strong Results" earning a 100% bonus; "Very Strong Results", 150%; and "Extraordinary Results" yields a 200% bonus.  Defendant utilizes a "forced" or calibrated bell curve on its Annual Performance Evaluations.

28.     On April 22, 2016, Plaintiff met one on one, face to face with Defendant's present Chief Executive Officer (CEO) Marc Bitzer, at his request.  At the time Bitzer was the Chief Operating Officer (COO).  Plaintiff advised COO Bitzer of the improvement possibilities under her leadership as the Executive Director of Logistics North America.  In the conversation with COO Bitzer, Plaintiff explained she had accepted the opportunity with Defendant because she planned and expected to be elevated to a Vice-Presidency position at Whirlpool.  Plaintiff was advised by COO Bitzer that her Senior Director of Logistics position at Whirlpool had previously been a Vice-President position just a few years before.  Plaintiff was reassured by COO Bitzer that her move to Defendant Whirlpool was a wise move considering her goal of being promoted to Vice-President.

29.     In June of 2016, Plaintiff was requested to attend, by Vice President Keppler, the Consortium Diversity Conference in St. Louis, Missouri, to recruit members for Whirlpool's Global Leadership Development Program (GLP).  The Defendant's GLP program is a highly selective program which "fast tracks" MBA students to get to Director in five (5) years.  Later, Plaintiff learned from her own observation and discussion with African Americans leaving Whirlpool, that Defendant, while hiring diverse talent, has a very poor retention rate for minorities, including African Americans in the GLP program as Whirlpool was losing its minority talent, after hire, within a few years.

30.    In 2016, Plaintiff's first full year at Defendant Whirlpool, she learned that Defendant performed an annual "Talent Planning" process for succession planning for each executive, by evaluating the employee's potential for higher level movement or lateral developmental placement into the executive ranks to prepare the executive for future movement.

31.    Defendant's Talent Planning for positions of Director level and higher was performed each year in the first quarter of the year.  The "Talent Assessment and Successor Nomination" Policy for "People Leaders" has three areas, which are evaluated by the executive employees "People Leader":

Talent Assessment

Using the "Nine Block"
Informs us as to the ability an employee has to move
Upward as well as their risk of leaving Whirlpool

Succession Planning
Identifies future roles for the employee at Whirlpool
and timing needed to develop to
attain those roles

Individual Development Plan
Development plan to close gaps and
Prepares the employee to move into
the identified role

32.    Not receiving an internal corporate mentor, in August 2016, Plaintiff Jones, knowing she required a corporate coach or mentor in her new position, began meeting with a contract mentor from August 2016 until February 2017.  Part of

Plaintiff's work with the mentor included a 360 degree survey, a tool utilized to obtain input from others, including her direct reports and other executives. The results from Plaintiff's 360° were positive. The contract coach was not sufficient to replace an internal Whirlpool mentor.

33.    In September 2016, Plaintiff Jones was asked by Vice President Keppler to speak at Harvard Symposium on behalf of Defendant Whirlpool on the topic of distribution technology. Plaintiff is recognized as a subject matter expert in lean logistics, including Supply Chain Improvement. Plaintiff attended the Harvard Symposium on behalf of Defendant.

34.    Plaintiff Jones' Talent Planning session with Defendant's Vice President Keppler in 2016 was positive, and Keppler reported she was on track to be Vice President, again discussing his Vice President role and Ken Kleinhample's Vice President role.

35.    In October 2016, Plaintiff was advised by Vice President Keppler that her new Whirlpool internal mentor would be the Vice-President of Customer and Appliances Kenneth Kleinhample, a white, male employee, also reporting, like Vice-President Keppler, to Joseph Liotine, the President of Whirlpool, North America.

36.    Plaintiff met with her assigned mentor on two formal occasions. At one point the mentor said he wondered why Plaintiff had been paired with him, expressing the fact that he had not volunteered to mentor her. Plaintiff knew she

was in succession for Vice President Kleinhample's position as Vice President Keppler had continued to advise her of the succession plan to place her in the position.

38.    Plaintiff Jones, despite a challenging first full year of employment with Defendant in December 2016, received an Annual Performance Review of "Strong Results". Plaintiff received additional compensation based upon the quality of her work. Plaintiff was advised by Keppler that she remained in consideration for a Vice President position. Though Plaintiff believed her performance rated higher than "Strong Results", she did not complain about the review, but asked Keppler what she would need to do to be rated "Extraordinary". Keppler told her to keep doing what she was doing.

39.    On December 6, 2016, Plaintiff received a "Strong Result" rating.

40.    In January 2017, Plaintiff was again asked to recruit for Defendant Whirlpool's Global Leadership Program (GLP) at the University of Michigan. Plaintiff accepted with the approval of Vice-President Keppler. This opportunity was important as only Defendant executives who were positively evaluated and held a positive perspective of Defendant Whirlpool were requested to take part in the recruitment.

41.    Again in June 2017 Plaintiff was requested by Human Resources to attend the Consortium Diversity Conference in Atlanta to recruit minorities for

Whirlpool's Global Leadership Program.  Plaintiff, as one of only three African American Senior Directors globally, was being used as Whirlpool's Diversity Ambassador, in addition to her full duties as Senior Director.

42.   In July 2017, Plaintiff's position as Senior Director of Logistics changed to Senior Director of Customer Fulfillment.  Plaintiff continued to report to Vice President Keppler.  Plaintiff's responsibility for employees increased from Four Hundred and Fifty (450) employees to Seven Hundred and Ten (710) employees.

43.   Defendant Whirlpool's significant increase of Plaintiff's area of responsibility in June 2017 did not come with a promotion to Vice-President.  At the time of Plaintiff's increase in responsibility, Vice-President Keppler's direct report in the Manufacturing area was a Vice-President, Byron Green.  Plaintiff's position should have been benchmarked with the additional duties to a Vice President position.  Further, prior to 2011, Plaintiff's initial position, reporting to a Vice-President, was a Vice-President position, a fact known by Plaintiff based on her April 2016 discussion with then COO Marc Bitzer.

44.   On August 29, 2017, Plaintiff observed her assigned mentor, Vice President Kleinhample, at Planks Restaurant with a group which included one of his direct reports.  The female direct report appeared to be very intoxicated.  Plaintiff, while talking to a colleague in the parking lot of the hotel/restaurant, saw her

assigned mentor, Vice President Kleinhample, come out of the restaurant with his arms around his direct report.  The location and placement of his arm appeared to be inappropriate for a working relationship.  The Vice President escorted his direct report to a car, assisted her to the passenger side, he got in the driver's seat and they drove off.   This observation made Plaintiff uncomfortable as she knew Kleinhample's inappropriate behavior was in violation of company policy.  Plaintiff was not mentored by Vice President Kleinhample in any way after that date.

45.   On or about December 1, 2017, Plaintiff met with Vice-President of Human Resources Carey Martin.  Plaintiff was told by Martin that she was checking in on how things were going.

46.   In or around mid-2017, during Plaintiff's talent planning meeting with Defendant's Vice-President Keppler, he advised Plaintiff she continued to be evaluated as Vice-President potential in her next promotion.  Plaintiff asked Keppler what it would take to be evaluated as an extraordinary employee.  Keppler provided her no specific input, but told her again to keep "doing what she was doing".

47.   On December 8, 2017, Plaintiff received a "Strong Results" Annual Performance Review.   Plaintiff expressed that she believed her performance, considering her increased area, should have been "Very Strong Results".  Plaintiff received all bonuses and benefits for her successful work year, but would have received higher bonus compensation with a higher evaluation.  Vice President

Keppler again advised Plaintiff she was on track to become a Vice President at Defendant Whirlpool.

Again, Plaintiff in her performance discussion in December 2017, asked what it would take to be evaluated as an exceptional performer. Plaintiff was told by Keppler to continue "doing what she had been doing". Though the Defendant's succession plan requires a developmental plan for the next projected position Keppler did not create one for Plaintiff.

48. In January 2018, Plaintiff now performing with an increase in workload and increased number of direct reports, continued to work at a high level.

49. On April 11, 2018, Plaintiff Jones met with Vice-President Keppler. Plaintiff advised him one of her direct reports, a younger, non-African American female, told Plaintiff she planned to resign from her Director position at Defendant Whirlpool because she had employment offers from two other firms. Prior to meeting with Vice President Keppler, Plaintiff Jones advised her direct report she did not want her to "leave as she was a top talent" in the organization. Plaintiff also met with Human Resources to determine what could be done to retain her direct report with Defendant Whirlpool.

50. During the April 11, 2018 meeting with Vice-President Keppler, to discuss Plaintiff's younger, non-African American direct report, Plaintiff was told then, by Keppler as he paced the floor with an agitated and pressured demeanor,

"She is in succession for your job.  I don't know how old you are, but you don't want to work until you are sixty-five (65) do you?"… "What is your plan.  We need to discuss".

After Vice President Keppler inserted Plaintiff's age and employment status into their conversation, he then told Plaintiff he would have a "career discussion" with Plaintiff "later".  Plaintiff found herself in shock that Defendant Vice President had spoken to her in such an illegal manner about her age.  Vice President Keppler told Plaintiff he would follow up himself, with Plaintiff's direct report, about her job offers.  Plaintiff was not invited to attend any of the meetings with Vice President Keppler and her younger, non-African American direct report.  Later Plaintiff learned Vice President Keppler promised the younger, non-African American Plaintiff's position as Plaintiff's successor.

51.    Plaintiff, on April 11, 2018 later in the day, advised Vice President Keppler that his discussion with her earlier that day, questioning her age and age based plans for continued employment at Defendant Whirlpool, was unethical and illegal.   Vice President Keppler asked Plaintiff did she want to bring Human Resources into the room, in a threatening tone.  Plaintiff stated it was up to him if he wanted Human Resources in the room.  Keppler did not call Human Resources into the meeting, but instead stated it was his opinion that Plaintiff "continued to have a path to a Vice President position in the company".  Plaintiff, in the meeting felt

shocked, embarrassed and humiliated by Vice President Keppler's treatment of her and expressed verbal favoritism toward her direct report.

52.     On April 17, 2018 during an offsite planning meeting at Dunrovin Conference Center, Whirlpool's leadership team, under Vice President Keppler, was asked to provide a brief "All About Me" slide as an ice breaker.  Prior to the meeting, during a staff meeting, Keppler provided a template for the "All About Me" slide. On the example he provided, the first item used as a description to introduce one's self, was age.  Again, Plaintiff was offended by Vice-President Keppler's focus on age.  Plaintiff was one of two older persons in the meeting of twelve (12).

53.     On May 31, 2018, Plaintiff was told by Vice President Keppler that in a North American Region (NAR) talent planning meeting held the day before, Plaintiff was "evaluated" in the Nine (9) Block Talent Planning Process, as no longer having a path to Vice President.  Every person at the talent review meeting was a white or non-African American executive, and all but one was younger than Plaintiff.  Plaintiff was told, by Keppler, in using a "Nine Box Management Process" she was moved to a box 7, which is a "non-promotable" box.  Keppler stated that seven (7) out of twelve (12) executives voted she was not promotable.  Plaintiff knew Keppler was retaliating against her because of her protected complaint of age discrimination on April 11, 2018.  Further, Plaintiff knew from the Nine (9) Block policy description her people leader was key to her recommendation.

54.     On May 31, 2018, Vice President Keppler advised Plaintiff that by talking to some of her direct reports it was revealed through feedback that Plaintiff Jones was "not happy".  Plaintiff found alleged comments by others that she was "unhappy" to be subjective, ambiguous and not a part of Defendant's executive evaluation criterion.  Plaintiff advised Keppler that her mother had passed away in October 2017, and that it was normal to experience grief.  Keppler told Plaintiff he wanted to have her take a 360 degree feedback survey, though she had taken one in July 2017, less than a year before.

Plaintiff learned that Vice President Keppler began to mentor her younger, non-African American direct report Director on a weekly basis.  Plaintiff also learned Keppler began to meet with her direct reports to get "feedback" on her performance.

55.     Plaintiff saw Vice President Keppler was retaliating against her by removing her from promotion to Vice President and setting her up for failure, after she complained to him about his discriminatory ageist remarks.

56.     On June 11, 2018, Plaintiff had a lunch meeting with Vice President Keppler in which he pressured her to take a 360 degree survey again, though he could not advise her how frequently an executive at her level was administered such a survey.  Keppler admitted he had never been given a 360° evaluation in his career at Whirlpool.  Plaintiff indicated to Vice President Keppler that she had taken, in

July 2017, a 360 degree survey.  The feedback given during coaching at that time was that there were "no de-railers", but that she should continue to work to build exposure and credibility.  Keppler told Plaintiff the 360 degree survey he was proposing was "to document anecdotal feedback".  Keppler did not mention how the feedback could be used in a positive manner to continue her path to the Vice President position, but was focused on alleged negative behavior.

57.    Plaintiff, by June 14, 2018, based upon the ongoing discrimination and hostility, filed a Defendant Whirlpool internal Human Resources complaint of discrimination and retaliation.  Plaintiff knew she was being treated disparately compared to younger and white or non-African American employees at Defendant Whirlpool; she was also being retaliated against by Vice President Keppler after she complained about his age bias statements.

58.    Though all of Plaintiff's Annual Performance Reviews are evaluated as "Strong Results", Plaintiff was removed from the Vice President successor plan. Further, Plaintiff knew her work had exceeded expectations or "Very Strong Results", though she was not evaluated at that level, thus affecting her total compensation.  Up until Plaintiff's April 11, 2018 discussion with Vice-President Keppler, Plaintiff was "on track" for promotion to Vice President at Defendant Whirlpool.

59.     In approximately July or August of 2018, it became known that the Vice President of Customer and Appliance Care would become vacant based upon Vice President Kleinhample moving to another area, laterally.  Vice President Keppler, prior to May 31, 2018, stated to Plaintiff that she was in succession for the Vice President of Customer and Appliance Care, yet no developmental plan was created by President Liotine and/or Vice President Keppler; and/or Vice President Kleinhample, who remained her ineffective mentor.

60.     On June 25, 2018, Vice President Keppler met with Plaintiff and Keppler advised her there was "no trust between them".  Vice President Keppler continued to treat Plaintiff in a hostile manner or ignored her presence, treating her as she was not present.  At the same time Vice President Keppler held one on one meetings with Plaintiff's younger, non-African American, direct report and would call the Director out of meetings she was having with Plaintiff.

61.     On July 3, 2018, Plaintiff met with Defendant Whirlpool's internal lawyer regarding her discrimination and retaliation internal complaint.

62.     On July 17, 2018, Plaintiff Jones, having been assigned an unofficial role as an Ambassador of Diversity, met with Human Resources Vice President Martin and advised her of the overall concern she had after talking with and observing the lack of retention of numerous Whirlpool's African American executives, that Whirlpool had failed to retain.  Plaintiff pointed out that over a dozen

African American employees in the prior two years left Defendant's employ. Promises of upward mobility were not met by Defendant though, like Plaintiff, promises were made in the recruitment and interview process. Further, there was an adverse hostile work culture toward African Americans once they arrived at Defendant if they complained.

63.     On July 25, 2018, Defendant's internal lawyer met with Plaintiff and advised her "there was no evidence to substantiate" her claims against Vice President Keppler. Plaintiff knew Defendant had "rubberstamped" Keppler's discriminatory and retaliatory treatment.

64.     Plaintiff, on July 26, 2018, again met with Human Resources Vice President Martin about her discrimination and retaliation complaint; and retention issues with other diverse employees, and was advised to meet with Camille Pierce, Sr. Director of Diversity. Vice President Martin also said she would look for another mentor for Plaintiff.

65.     On July 26, 2018, Plaintiff met with Senior Director Pierce and advised her of what she knew of the retention issues affecting African American employees specifically. Plaintiff also advised her of the stressful impact she was experiencing related to the discriminatory and retaliatory work environment created by Vice President Keppler.

66.    On August 10 and 16, 2018, Plaintiff met with Vice President Cary Martin.  Plaintiff questioned her about whether or not a different position at Defendant Whirlpool existed at her same level of Senior Director or a Vice President.  Because of Vice President Keppler's hostile treatment and retaliatory behaviors Plaintiff stated she was working in a hostile work environment.  Plaintiff was advised there was no vice presidency for her, even though a Vice President position was open, as Vice President of Customer and Appliance Care, reporting to President Liotine.  Defendant Vice President Keppler had previously discussed the Vice President role of Customer and Appliance Care as one of the two possible successions for Plaintiff in their career discussions.  Plaintiff was told Defendant was conducting an external search to replace the Vice President of Customer and Appliance Care.  Plaintiff was later told by Vice President Martin she could possibly have a demotion to a plant level position, or  accept a severance package.  Thereafter, Vice President Martin offered Plaintiff a severance package.

67.    From April 11, 2018 to September 2018, Vice President Keppler, who Plaintiff reported directly to, treated her hostilely and continued to talk one on one with her direct reports, undermining her role as their Senior Director.

68.    Plaintiff, on September 13, 2018, was sent an email by Vice President of Human Resources Martin stating, "I will place you on paid administrative leave while we investigate (your complaint) so you are no longer in the environment".

Plaintiff knew this "administrative leave" was in further retaliation against her for making a complaint based on age and race discrimination.

69.     On September 14, 2018, Plaintiff went on a Family Medical Leave due to the severe hostile and retaliatory work environment.

70.     On October 2, 2018, Plaintiff filed an Equal Employment Opportunity charge with EEOC.

71.     While on medical leave Plaintiff was advised she would not be paid after October 14, 2018.  The remainder of Plaintiff's FML was unpaid through December 10, 2018.  Plaintiff's physician had not released Plaintiff to return to work. Defendant had not scheduled Plaintiff for an independent medical examination. Plaintiff saw Defendant's failure to continue her pay as further retaliation.

72.     On December 10, 2018, Plaintiff Jones returned to work.  Though the position of Vice President of Customer and Appliance Care, reporting to President Liotine was open, Plaintiff was not offered the position nor did either President Liotine or Vice President Keppler talk with her about the position.

73.     Plaintiff learned that her direct report, the younger, non-African American Director had assumed her position in Plaintiff's absence.  The same week Plaintiff returned to work, her younger white direct report was given a corporate wide accolade, which informed all that Plaintiff had been on leave and cast aspersion on Plaintiff's performance.

74.     After returning to work on December 10, 2018, Plaintiff expressed to Human Resources her interest in the Vice President of Customer and Appliance Care.

## COUNT I

## VIOLATION OF AGE DISCRIMINATION IN EMPLOYMENT ACT (ADEA) 29 USC CODE CHAPTER 14

75.     Plaintiff repeats, realleges and incorporates paragraph 1 through 74 as set forth here and above by reference.

76.     Plaintiff Jones, at the time of the acts plead in this Complaint, was fifty-six (56)  to fifty-seven (57) years old, and continuing, has been over the age of forty (40) under 29 USC §631, and thus protected by the ADEA.

77.     Defendant Whirlpool has and continues to violate the ADEA by discriminating against Plaintiff Jones in terms and conditions of her employment, including but not limited to the following ways:

  (a)     Making Plaintiff's age a criterion to be used in her continuing promotability to the position of Vice-President and higher at the Defendant Corporation;

  (b)     Vice-President Keppler, to whom Plaintiff directly report, referring to Plaintiff's age as a factor to be considered in her continued employment and career advancement at Defendant Whirlpool;

  (c)     Evaluating Plaintiff's annual performance with a disparate standard compared to the standard utilized to evaluate younger employees for terms and conditions of employment, including promotability;

(d)    Not providing Plaintiff with internal and/or external mentoring or executive coaching to provide Plaintiff with the advance to the position of Vice-President as promised in its active, aggressive recruitment of Plaintiff;

(e)    Increasing Plaintiff's work duties in 2017 with her direct reports, almost doubling, without promoting her to Vice-President, though her position had previously been a Vice-President;

(f)    Favoring younger employees over Plaintiff, including having her leader directly mentor and promise advancement to Plaintiff's younger direct reports, without Plaintiff's involvement, evaluation or input;

(g)    Refusing to allow Plaintiff the temporary opportunity to act as a Vice President, though opening(s) were available to do so;

(h)    Requiring Plaintiff to act as an Ambassador for Defendant, taking time out of her work schedule, yet not giving Plaintiff positive credit in her Annual Performance Reviews;

(i)    Requiring Plaintiff to be subject to additional scrutiny not given to younger persons in Executive Level positions, including but not limited to subjective 360° (Three Hundred and Sixty Degree) evaluations;

(j)    Pretextually and untruthfully evaluating, by Vice-President Keppler, Plaintiff's complaint of age discrimination, instead embarrassing and humiliating Plaintiff Jones because of the complaint;

(k)    Shortly after Plaintiff's complaint of age discrimination, trumping up charges of "performance" impairment to "justify" removal of Plaintiff from Defendant's succession plan, through its Nine (9) Block subjective alleged talent planning process for advancement to Vice-President;

(l)   Defendant Vice-President Keppler and Vice-President of Human Resources Martin using Plaintiff's age discrimination complaint as a pretext to offer her a demotion and/or a severance package;

(m)   Humiliating and embarrassing Plaintiff to such a harsh degree by placing her on an administrative leave.  Plaintiff required a work related Family Medical Leave for the first time in her career;

(n)   Requiring Plaintiff Jones to miss unpaid time off from work;

(o)   In 2018, Vice-President Keppler evaluated Plaintiff Jones in a pretextual, negative manner, while corporate wide praising Plaintiff's younger direct reports who temporarily stepped into Plaintiff's position of Senior Director of Customer Fulfillment while she was on medical leave with Defendant Whirlpool corporate wide ward with a statement "I can't express enough…." Which cast severe aspersions on Plaintiff's performance and reputation and advised all that she was on a medical leave; and

(p)   Create for Plaintiff Jones an age hostile, and harassing work environment.

78.   As a direct and proximate result of said acts and omissions under ADEA, 1967, as amended, by Defendant's agents and employees, Plaintiff has suffered and will continue to suffer lost wages and pension benefits, loss of earning capacity, loss of dignity and enjoyment of life, extreme mental and emotional distress, pain and suffering, nervousness, embarrassment and humiliation, requiring professional medical treatment and medication all past, present, and future.

WHEREFORE, Plaintiff Nardelia Alison Jones, demands judgment against Defendant for such amount in excess of Seventy-Five Thousand Dollars

($75,000.00) as Plaintiff is found to be entitled, plus interest, costs, and reasonable attorney's fees; and/or all injunctive relief allowed under ADEA.

## COUNT II

## VIOLATION OF TITLE VII - CIVIL RIGHTS ACT OF 1964, AS AMENDED 42 USC § 2000e, *et seq.*, BASED ON RACE, INCLUDING PATTERN AND PRACTICE DISCRIMINATION

79.   Plaintiff repeats, realleges and incorporates paragraph 1 through 78 as set forth here and above by reference.

80.   Plaintiff Alison Jones is an African American female.  From 2015 to present, Defendant Whirlpool has failed to retain its African American executive employees, based in part on its failure to provide its African American employees with the same standard for advancement as comparable white employees. Defendant, in its utilization of a forced ranking "bell curve" Annual Performance Review calibration process, adversely impacts Defendant's African American executive employees.   The subjective Annual Performance Review process, adversely affects the total compensation of Defendant's African American executives.

81.   Promising Plaintiff Jones and other African American candidates in the recruitment process that their employment at Defendant Whirlpool would lead to advancement and leadership opportunities which Defendant knows it will not provide or materialize after those African American candidates, including Plaintiff,

detrimentally rely on such promises and leave their employment to join Defendant Whirlpool.  The process results in a revolving door for Defendant's African American executives.

82.    Utilizing a subjective alleged talent planning tool, the Nine (9) Block, which has a disparate adverse impact on African Americans, and a favorable subjective impact on non-African Americans.  The Nine (9) Block tool pretextually evaluates Plaintiff and other African American employees as "not promotable".  The Defendant's Nine (9) Block process in fact imposes a cement block on promotability; which in turn, creates a high failure to retain rate for African American, executive talent.  Once the discriminatory, true nature of Defendant Whirlpool's "Succession Plan" becomes obvious, African Americans leave the company or are "managed" out.

83.    Defendant Whirlpool knows the effect of the "Nine (9) Block" talent planning tool on its retention of African American executives, and yet allows African American to be subjected to its discriminatory impact.

84.    Defendant Whirlpool has and continues to violate Title VII of the Civil Rights Act of 1964 by discriminating against Plaintiff Jones in terms and conditions of her employment, including but not limited to the following ways:

(a)    Making Plaintiff's age a criterion to be used in her continuing promotability to the position of Vice-President and higher at the Defendant Corporation;

(b)     Vice-President Keppler, to whom Plaintiff directly report, referring to Plaintiff's age as a factor to be considered in her continued employment and career advancement at Defendant Whirlpool;

(c)     Evaluating Plaintiff's annual performance with a disparate standard compared to the standard utilized to evaluate younger employees for terms and conditions of employment, including promotability;

(d)     Utilizing a forced ranking, "bell curve" Annual Performance Review, calibration process which adversely impacts African American employees in position of Director and higher;

(e)     Not providing Plaintiff with executive internal and/or external mentoring or executive coaching to provide Plaintiff with the advance to the position of Vice-President as promised in its active, aggressive recruitment of Plaintiff;

(f)     Increasing Plaintiff's work duties in 2017 with her direct reports, almost doubling, without promoting her to Vice-President, though her position had previously been a Vice-President;

(g)     Favoring younger employees over Plaintiff, including having her leader directly mentor and promise advancement to Plaintiff's younger direct reports, without Plaintiff's involvement, evaluation or input;

(h)     Refusing to allow Plaintiff the temporary opportunity to act as a Vice President, though opening(s) were available to do so, and where Plaintiff's present position was years before labeled Vice-President and would be a Vice-President in other corporations;

(i)     Requiring Plaintiff to act as an Ambassador for Defendant, taking time out of her work schedule, yet not giving Plaintiff positive credit in her Annual Performance Reviews for such ancillary work not assigned to non-African American employees;

(j)     Requiring Plaintiff to be subject to additional scrutiny not given to non-African American persons in Executive Level positions, including but not limited to subjective 360° (Three Hundred and Sixty Degree) evaluations;

(k)     Pretextually and untruthfully evaluating, by Vice-President Keppler, Plaintiff's complaint of race discrimination, instead embarrassing and humiliating Plaintiff Jones because of the complaint;

(l)     Shortly after Plaintiff's complaint, filed on June 14, 2018, of race discrimination, trumping up charges of "performance" impairment to "justify" removal of Plaintiff from Defendant's succession plan, through its Nine (9) Block subjective alleged talent planning for advancement to Vice-President;

(m)     Defendant Vice-President Keppler and Vice-President of Human Resources Martin using Plaintiff's race discrimination complaint as a pretext to offer her a demotion and/or a severance package;

(n)     Humiliating and embarrassing Plaintiff to such a harsh degree by placing her on an administrative leave. Plaintiff required a work related Family Medical Leave for the first time in her career;

(o)     Requiring Plaintiff Jones to miss unpaid time off from work;

(p)     In 2018, Vice-President Keppler evaluated Plaintiff Jones in a pretextual, negative manner, while corporate wide praising Plaintiff's younger direct reports who temporarily stepped into Plaintiff's position of Senior Director of Customer Fulfillment while she was on medical leave with Defendant Whirlpool corporate wide award with a statement "I can't express enough…." Which cast severe aspersions on Plaintiff's performance and reputation and advised all that she was on a medical leave; and

(q)     Create for Plaintiff Jones an race hostile, and harassing work environment while favoring Plaintiff's white direct report.

85.     As a direct and proximate result of said acts and omissions under Title VII – Civil Rights Act of 1964, as amended, by Defendant's agents and employees, Plaintiff has suffered and will continue to suffer lost wages and pension benefits, loss of earning capacity, loss of dignity and enjoyment of life, extreme mental and emotional distress, pain and suffering, nervousness, embarrassment and humiliation, requiring professional medical treatment and medication all past, present, and future.

WHEREFORE, Plaintiff Nardelia Alison Jones, an African American, demands judgment against Defendant for such amount in excess of Seventy-Five Thousand Dollars ($75,000.00) as Plaintiff is found to be entitled, plus interest, costs, and reasonable attorney's fees; and/or all injunctive relief allowed under Title VII.

## COUNT III

## RETALIATION BASED ON THE ADEA AND PURSUANT TO TITLE VII - CIVIL RIGHTS ACT OF 1964, AS AMENDED 42 USC § 2000e, *et seq.*, BASED ON RACE

86.     Plaintiff repeats, realleges and incorporates paragraph 1 through 85 as set forth here and above by reference.

87.     Plaintiff Jones, engaged in protective activity in June 2018 and in October 2018, by filing EEOC charges with the federal government based on her age and race, African American.

88.   In September Plaintiff Jones was told by Defendant that she was being placed on "administrative leave" until her complaint had been investigated. Plaintiff, in July 2018, had already been told that her complaint as meritless.

89   As a direct consequence of Plaintiff's protected activity, Defendant, through its Vice-Presidents, has subjected Plaintiff Jones to retaliation and retaliatory harassment in the terms and conditions of her employment, including but not limited to:

(a)   Removal of Plaintiff from Succession Plan for Vice-President though the position for which she was told she was the successor, is empty;

(b)   Placing Plaintiff on an administrative leave after she filed a complaint of discrimination and asked for a different work assignment;

(c)   Told she would have to be demoted if she wanted a new position;

(d)   Failing to provide Plaintiff with development to promote Plaintiff to Vice-President;

(e)   Providing Plaintiff with untrue performance reviews, which created a false perception of Plaintiff as a professional and harms her reputation;

(f)   Praising Plaintiff's direct reports in such a way to cast aspersions of Plaintiff's work performance and advise the entire Whirlpool Corporation Plaintiff was on medical;

(g)   Embarrassing and humiliating Plaintiff in front of her direct reports, management, coworkers, colleagues and others including Vice President Keppler, engaging repeatedly in one on ones with Plaintiff's direct reports;

(h)     Harassing the Plaintiff in a retaliatory manner with false charges of poor performance; and

(i)     Attempting to keep Plaintiff from returning to work after her FML, until she made an appointment with outside counsel to "investigate" on Defendant's behalf, her age and discrimination complaint.

90.     As a direct and proximate result of said retaliatory acts and omissions by Defendant's agents and employees, Plaintiff has suffered and will continue to suffer lost wages and pension benefits, loss of earning capacity, loss of dignity and enjoyment of life, extreme mental and emotional distress, pain and suffering, nervousness, embarrassment and humiliation, requiring professional medical treatment and medication all past, present, and future.

WHEREFORE, Plaintiff Nardelia Alison Jones, demands judgment against Defendant for such amount in excess of Seventy-Five Thousand Dollars ($75,000.00) as Plaintiff is found to be entitled, plus interest, costs, and reasonable attorney's fees; and/or all injunctive relief allowed under the ADEA and Title VII.

## COUNT IV

### HOSTILE AND HARASSING WORK ENVIRONMENT BASED ON AGE UNDER ADEA AND ON RACE  PURSUANT TO TITLE VII - CIVIL RIGHTS ACT OF 1964, AS AMENDED 42 USC § 2000e, *et seq.*, BASED ON RACE

91.     Plaintiff repeats, realleges and incorporates paragraph 1 through 90 as set forth here and above by reference.

92.    Defendant Whirlpool Corporation violated Title VII in regard to its conduct and omissions toward Plaintiff Jones in the following manner:

(a)    Subjecting Plaintiff to a hostile work environment as an older African American, in terms and conditions of employment, including but not limited to Vice-President Keppler and Vice-President Martin;

(b)    Subjecting her to age based comments;

(c)    Ignoring the Plaintiff in meetings and public events as if she did not exist;

(d)    Praising corporate wide Plaintiff's direct report who replaced Plaintiff by making statements about Plaintiff's medical leave and casting aspersions on Plaintiff's work, thus negatively affecting her Whirlpool reputation;

(e)    Spreading rumors that she was "not happy";

(f)    Stating Plaintiff was leaving the Defendant Whirlpool Corporation when she had not made such a decision to do so;

(g)    Providing others with untrue statement of her performance, while providing others with support and accolades; and

(h)    Attempting to place Plaintiff on an administrative leave, as she returned from medical.

93.    As a direct and proximate result of said hostile and harassing work environment by Defendant's agents and employees, Plaintiff Jones has suffered and will continue to suffer lost wages and pension benefits, loss of earning capacity, loss of dignity and enjoyment of life, extreme mental and emotional distress, pain and

suffering, nervousness, embarrassment and humiliation, requiring professional medical treatment and medication all past, present and future.

WHEREFORE, Plaintiff Nardelia Alison Jones, demands judgment against Defendant for such amount in excess of Seventy-Five Thousand Dollars ($75,000.00) as Plaintiff is found to be entitled, plus interest, costs, and reasonable attorney's fees; and/or all injunctive relief allowed under the ADEA and Title VII.

## ANCILLARY COUNT V

## MICHIGAN ELLIOTT LARSEN CIVIL RIGHTS ACT
## BASED ON AGE AND RACE

94.     Plaintiff repeats, realleges and incorporates paragraph 1 through 93 as set forth here and above by reference.

95.     Plaintiff Jones, under the Michigan Elliott Larsen Civil Rights Act has been subjected to disparate treatment based upon her status as an older African American, including:

(a)    Making Plaintiff's age a criterion to be used in her continuing promotability to the position of Vice-President and higher at the Defendant Corporation;

(b)    Vice-President Keppler, to whom Plaintiff directly report, referring to Plaintiff's age as a factor to be considered in her continued employment and career advancement at Defendant Whirlpool;

(c)    Evaluating Plaintiff's annual performance with a disparate standard compared to the standard utilized to evaluate younger employees for terms and conditions of employment, including promotability utilizing a Bell Curve, Performance Review

Process, calibrated to have an adverse impact on African American executive employees;

(d)     Not providing Plaintiff with internal and/or external mentoring or executive coaching to provide Plaintiff with the advance to the position of Vice-President as promised in its active, aggressive recruitment of Plaintiff, an older African American;

(e)     Increasing Plaintiff's work duties in 2017, including total her direct reports, almost doubling, without promoting her to Vice-President, though her position had previously been a Vice-President;

(f)     Favoring younger employees over Plaintiff, including having her leader directly mentor and promise advancement to Plaintiff's younger direct reports into Plaintiff's present position, without Plaintiff's involvement, evaluation or input;

(g)     Refusing to allow Plaintiff the temporary opportunity to act as a Vice President, though an opening was available to do so;

(h)     Requiring Plaintiff to act as an Ambassador for Defendant, taking time out of her work schedule, yet not giving Plaintiff positive credit in her Annual Performance Reviews;

(i)     Requiring Plaintiff to be subject to additional scrutiny not given to younger persons and non-African Americans in Executive Level positions, including but not limited to subjective 360° (Three Hundred and Sixty Degree) evaluations;

(j)     Pretextually and untruthfully evaluating, by Vice-President Keppler, Plaintiff's complaint of age discrimination, instead embarrassing and humiliating Plaintiff Jones because of the complaint;

(k)     Shortly after Plaintiff's complaint of age discrimination, trumping up charges of "performance" impairment to "justify" removal of Plaintiff from Defendant's succession plan, through its Nine (9) Block subjective talent planning for advancement to Vice-President;

(l)     Utilizing the Defendant's Nine (9) Block successor plan in a manner to have an adverse impact African American employees promotability;

(m)    Defendant Vice-President Keppler and Vice-President of Human Resources Martin using Plaintiff's age discrimination complaint as a pretext to offer her a demotion and/or a severance package;

(n)     Humiliating and embarrassing Plaintiff to such a harsh degree by placing her on an administrative leave.  Plaintiff required a work related Family Medical Leave for the first time in her career;

(o)     Requiring Plaintiff Jones to take unpaid time off from work after an approved FML leave;

(p)     In 2018, Vice-President Keppler evaluated Plaintiff Jones in a pretextual, negative manner, while corporate wide praising Plaintiff's younger direct reports who temporarily stepped into Plaintiff's position of Senior Director of Customer Fulfillment while she was on medical leave with Defendant Whirlpool corporate wide ward with a statement "I can't express enough…." Which cast severe aspersions on Plaintiff's performance and reputation and advised all that she was on a medical leave; and

(q)     Create for Plaintiff Jones an age and race hostile, and harassing work environment.

96.    As a direct and proximate result of said acts and omissions under ADEA, 1967, as amended, by Defendant's agents and employees, Plaintiff has suffered and will continue to suffer lost wages and pension benefits, loss of earning capacity, loss of dignity and enjoyment of life, extreme mental and emotional distress, pain and suffering, nervousness, embarrassment and humiliation, requiring professional medical treatment and medication all past, present, and future.

WHEREFORE, Plaintiff Nardelia Alison Jones, demands judgment against Defendant for such amount in excess of Seventy-Five Thousand Dollars ($75,000.00) as Plaintiff is found to be entitled, plus interest, costs, and reasonable attorney's fees; and/or all injunctive relief allowed under ADEA.

## ANCILLARY COUNT VI

## MICHIGAN ELLIOTT LARSEN CIVIL RIGHTS ACT
## BASED ON RETALIATION

97.     Plaintiff repeats, realleges and incorporates paragraph 1 through 96 as set forth here and above by reference.

98.     Defendant Whirlpool Corporation violated Title VII in regard to its conduct and omissions toward Plaintiff Jones in the following manner:

(a)     Subjecting Plaintiff to a hostile work environment as an older African American, in terms and conditions of employment, including but not limited to Vice-President Keppler and Vice-President Martin;

(b)     Subjecting her to age based comments;

(c)     Ignoring the Plaintiff in meetings and public events as if she did not exist;

(d)     Praising corporate wide Plaintiff's direct report who replaced Plaintiff by making statements about Plaintiff's medical leave and casting aspersions on Plaintiff's work, thus negatively affecting her Whirlpool reputation;

(e)     Spreading rumors that she was "not happy";

(f)     Stating Plaintiff was leaving the Defendant Whirlpool Corporation when she had not made such a decision to do so; and

39

(g)     Providing others with untrue statement of her performance, while providing others with support and accolades.

99.     As a direct and proximate result of said hostile and harassing work environment by Defendant's agents and employees, Plaintiff Jones has suffered and will continue to suffer lost wages and pension benefits, loss of earning capacity, loss of dignity and enjoyment of life, extreme mental and emotional distress, pain and suffering, nervousness, embarrassment and humiliation, requiring professional medical treatment and medication all past, present and future.

WHEREFORE, Plaintiff Nardelia Alison Jones, demands judgment against Defendant for such amount in excess of Seventy-Five Thousand Dollars ($75,000.00) as Plaintiff is found to be entitled, plus interest, costs, and reasonable attorney's fees; and/or all injunctive relief allowed under the ADEA and Title VII.

## ANCILLARY COUNT VII

## MICHIGAN ELLIOTT LARSEN CIVIL RIGHTS ACT
## BASED ON HOSTILE AND HARRASSING WORK ENVIRONMENT

100.    Plaintiff repeats, realleges and incorporates paragraph 1 through 99 as set forth here and above by reference.

101.    Defendant Whirlpool Corporation violated Title VII in regard to its conduct and omissions toward Plaintiff Jones in the following manner:

(a)     Subjecting Plaintiff to disparate treatment compared to younger employees and/or non-African Americans;

(b)    Utilizing the subjective 9 Block alleged talent planning process resulting in disparate impact;

(c)    Retaliating against Plaintiff after she complained of discrimination and filed an internal complaint;

(d)    Subjecting Plaintiff to a hostile work environment as an older African American, in terms and conditions of employment, including but not limited to Vice-President Keppler and Vice-President Martin;

(e)    Subjecting her to age based comments;

(f)    Ignoring the Plaintiff in meetings and public events as if she did not exist;

(g)    Praising corporate wide Plaintiff's direct report who replaced Plaintiff by making statements about Plaintiff's medical leave and casting aspersions on Plaintiff's work, thus negatively affecting her Whirlpool reputation;

(h)    Spreading rumors that she was "not happy" implying to others that she was not performing her position of Senior Director;

(i)    Stating Plaintiff was leaving the Defendant Whirlpool Corporation when she had not made such a decision to do so; and

(j)    Providing others with untrue statement of her performance, while providing others with support and accolades.

102.   As a direct and proximate result of said hostile and harassing work environment by Defendant's agents and employees, Plaintiff Jones has suffered and will continue to suffer lost wages and pension benefits, loss of earning capacity, loss of dignity and enjoyment of life, extreme mental and emotional distress, pain and

suffering, nervousness, embarrassment and humiliation, requiring professional medical treatment and medication all past, present and future.

WHEREFORE, Plaintiff Nardelia Alison Jones, demands judgment against Defendant for such amount in excess of Seventy-Five Thousand Dollars ($75,000.00) as Plaintiff is found to be entitled, plus interest, costs, and reasonable attorney's fees; and/or all injunctive relief allowed under the ADEA and Title VII.

Respectfully submitted,

EDWARDS & JENNINGS, P.C.

By:___/s/ Carl R. Edwards_____
        Carl R. Edwards (P24952)
        Attorney for Plaintiff
        cedwards@edwardsjennings.com

Dated:  December 26, 2018

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NARDELIA ALISON JONES,

                  Plaintiff,

v.

WHIRLPOOL CORPORATION,
a foreign corporation,

                  Defendant.

Case No.

Hon:

_____/

Carl R. Edwards (P24952)
Alice B. Jennings (P29064)
EDWARDS & JENNINGS, PC
Attorneys for Plaintiff
65 Cadillac Square, Suite 2710
Detroit, MI  48226
(313) 961-5000
ajennings@edwardsjennings.com
cedwards@edwardsjennings.com

_____/

## **DEMAND FOR JURY TRIAL**

NOW COMES Plaintiff, NARDELIA ALISON JONES, by and through her attorneys, EDWARDS & JENNINGS, P.C., by Carl R. Edwards and hereby demands a Jury trial in the above matter.

43

Respectfully submitted,

EDWARDS & JENNINGS, P.C.

By:   /s/ Carl R. Edwards
      Carl R. Edwards (P24952)
      Alice B. Jennings (P29064)
      Attorneys for Plaintiff
      Cadillac Tower Building
      65 Cadillac Square, Suite 2710
      Detroit, MI 48226
      (313) 961-5000
      cedwards@edwardsjennings.com

Dated:  December 26, 2018